BGK:JV:CSK
F. #2026V02612

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,

Plaintiff,

-against-

ANY AND ALL CRYPTOCURRENCY
SEIZED FROM TETHER LTD. OR
OTHERWISE ASSOCIATED
WITH VIRTUAL CURRENCY ADDRESS
0xc390A623AABD2964Dc72ed8a8F1BD26A8AAbd200,
AND ALL PROCEEDS TRACEABLE THERETO.

Defendants *in rem.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**VERIFIED COMPLAINT IN REM**

Civil Action No. 26-5289

Plaintiff, United States of America, by its attorneys, Joseph Nocella, Jr., United States Attorney for the Eastern District of New York and John Vagelatos, Assistant United States Attorney, of counsel, alleges upon information and belief as follows:

## NATURE OF THE ACTION

1. This is a civil action in rem to forfeit and condemn to the use and benefit of the United States the above-captioned defendant property and all proceeds traceable thereto (collectively, the "Defendants *In Rem*").

2. The Defendants *In Rem* are subject to forfeiture pursuant to: (a) 18 U.S.C. § 981(a)(1)(C), as any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343, or a conspiracy to commit such offense, in violation of 18 U.S.C. § 1349; and/or (b) 18 U.S.C. § 981(a)(1)(A), as any property, real or personal, involved in a transaction or attempted transaction involving money laundering, in

violation of 18 U.S.C. § 1956, or conspiracy to commit money laundering, or any property traceable to such property.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over this action, pursuant to 28 U.S.C. §§ 1345 and 1355.

4. Venue lies in the Eastern District of New York, pursuant to 28 U.S.C. §§ 1355 and 1395, in that the acts and omissions giving rise to forfeiture occurred in the Eastern District of New York.

**THE DEFENDANTS IN REM**

5. The Defendants *In Rem* consist of the following:

(a) Any and all cryptocurrency seized from Tether Ltd. or otherwise associated with virtual currency address 0xc390a623aabd2964dc72ed8a8f1bd26a8aabd200, and all proceeds traceable thereto.

6. The Defendants *In Rem* are currently in the custody of the United States Secret Service.

**STATUTORY BACKGROUND**

**A. Wire Fraud**

7. Pursuant to Title 18, United States Code, Section 1343 it is unlawful for any person to devise a scheme or artifice to defraud, and to obtain money or property by means of materially false and fraudulent pretenses, representations, promises, and for purposes of executing such scheme and artifice, to transmit or cause to be transmitted by means of wire communications in interstate and foreign commerce writings, signs, signals, pictures and sounds.

8. Pursuant to 18 U.S.C. § 1349, it is unlawful for any person to attempt or conspire to commit wire fraud contrary to 18 U.S.C. § 1343.

**B. Money Laundering**

9. Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for anyone to conduct one or more financial transactions in and affecting interstate or foreign commerce, which transactions in fact involved the proceeds of one or more specified unlawful activities, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, and knowing that such transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity.

10. Pursuant to 18 U.S.C. § 1956(a)(2)(B)(i), it is unlawful for anyone to transport, transmit, or transfer, or attempt to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of one or more specified unlawful activities.

11. Pursuant to 18 U.S.C. § 1956(h), it is unlawful for any person to conspire to commit any offense defined in 18 U.S.C. § 1956.

12. Pursuant to 18 U.S.C. § 1961(1)(B), as incorporated by 18 U.S.C. § 1956(c)(7)(A), the term "specified unlawful activity" includes violations of 18 U.S.C. §§ 1343, 1349, and 1956.

### C. Forfeiture Statutes

13. Title 18, United States Code, Section 981(a)(1)(C) provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense, or conspiracy to commit such an offense, which constitutes "specified unlawful activity," as defined in Title 18, United States Code, Section 1956(c)(7).

14. Title 18, United States Code Section 981(a)(1)(A) provides for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of Section 1956, or any property traceable to such property.

## CRYPTOCURRENCY BACKGROUND

15. Cryptocurrencies are a type of digital asset that can act as a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Ether, and Tether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper. Cryptocurrency can be exchanged directly person-to-person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; but instead is generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a

distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.

16. Cryptocurrency is stored in virtual accounts called wallets. Wallets are software programs that interface with blockchains and generate and/or store public and private addresses used to send and receive cryptocurrency. A public address (or "public key") is similar to a bank account number, and a private address (or "private key") is similar to a PIN number or password that allows a user to access and transfer value associated with the public key.

17. To conduct transactions on a blockchain, an individual must use the public key and the private key. A public key is represented as a case-sensitive string of letters and numbers, 26 to 36 characters long. Each public key is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the public key. Only the holder of a public address's corresponding private key can authorize any transfers of cryptocurrency from that public address to another cryptocurrency public address.

**A. <u>Bitcoin</u>**

18. Bitcoin ("BTC") is one of many types of cryptocurrencies.

19. Bitcoin are sent to and received from Bitcoin public addresses or public keys.

20. Each Bitcoin public address or public key is controlled through a unique corresponding private key. Anyone with both the public address and corresponding public key can authorize transfers of Bitcoin from the public address to other Bitcoin public addresses. Users can operate multiple Bitcoin addresses at any given time and may use a unique Bitcoin public address for each and every transaction.

21. To acquire Bitcoin, a typical user purchases them from a virtual currency exchange. A virtual currency exchange is a business that allows customers to trade virtual currencies for other virtual currencies or conventional fiat money (e.g., U.S. dollars, Russian rubles, euros). Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies). Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information about their customers and verify their clients' identities.

22. To transfer Bitcoin from one Bitcoin public address to a different Bitcoin public address, the sender transmits a transaction announcement, which is electronically signed with the sender's private key, across the peer-to-peer Bitcoin network. To complete a transaction, a sender needs only the Bitcoin public address and corresponding Bitcoin private key and the receiving party's Bitcoin public address. This information on its own rarely reflects any identifying information about either the sender or the recipient. As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a Bitcoin transaction itself. Once the sender's transaction announcement is verified by the network, the transaction is added to the blockchain, a decentralized public ledger that records every Bitcoin transaction. The blockchain logs every Bitcoin public address that has ever received Bitcoin and maintains records of every transaction for each Bitcoin public address.

23. While a Bitcoin public address owner's identity is generally anonymous within the blockchain (unless the owner opts to make information about the owner's Bitcoin public address publicly available), investigators can use the blockchain to identify the owner of a particular Bitcoin public address. Because the blockchain serves as a searchable public ledger of

every Bitcoin transaction, investigators can trace transactions to, among other recipients, Bitcoin exchangers. Because Bitcoin exchangers generally collect identifying information about their customers, as discussed above, subpoenas or other appropriate legal process submitted to exchangers can, in some instances, reveal the true identity of an individual responsible for a Bitcoin transaction.

**B. Ethereum**

24. Ethereum is another type of cryptocurrency.

25. Like Bitcoin, Ethereum is traded through online exchanges and stored in various cryptocurrency wallets.

26. The Ethereum blockchain is a distinct blockchain from Bitcoin that records Ethereum transactions.

**C. Tether**

27. Tether ("USDT") is another type of cryptocurrency, which is issued by Tether Ltd., a company registered and currently headquartered in El Salvador. Although Tether Ltd. is headquartered outside of the United States, USDT is traded within the United States.

28. Like Bitcoin, Tether is a blockchain-based virtual currency that is widely used and circulated over the Internet. However, unlike Bitcoin, Tether is a "stablecoin."

29. Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar such that one Tether is equal to one U.S. dollar. Tether is backed by reserves in fiat currency. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. Tether and other stablecoins are

primarily utilized by cryptocurrency investors who want to avoid the extreme volatility of other cryptocurrencies while keeping value within the cryptocurrency market.

30. Unlike Bitcoin, USDT is "centralized," meaning it is issued and controlled by a governing body, namely Tether Ltd. Tether Ltd. is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens. This means that Tether Ltd. has the ability to ban public cryptocurrency addresses suspected of illegal activity from sending and receiving USDT (a process known as "blacklisting"), resulting in the freezing of USDT assets contained within that public cryptocurrency address.

## FACTUAL BACKGROUND

31. In Account Takeover (hereinafter "ATO") fraud crimes, cybercriminals deliberately gain unauthorized access to a victim's online bank, payroll, health saving, social media account, or cryptocurrency wallet,[1] with the goal of stealing money or information for personal gain. The goal of these ATO crimes is to steal funds, redirect funds, or otherwise affect funds of the targeted victim.

32. Cybercriminals may utilize social engineering to obtain the victim's username, password, and/or other personal information to successfully log into, or otherwise gain access to, the victim's financial account, including but not limited to their cryptocurrency wallets. Once the financial account is accessed, cybercriminals then transfer funds out of the victim's account and into an account or accounts that the cybercriminals control.

33. In November of 2021, Victim-1, an individual who resides in Queens, New York, was interested in purchasing a new cryptocurrency known as VLaunch, which was

---

[1] A cryptocurrency wallet is a software application that stores a user's public addresses and private keys. A cryptocurrency wallet also allows users to send and receive virtual currencies. Multiple addresses can be stored in wallet.

being promoted on social media by "CJ," whose identity is known to law enforcement. CJ is a prominent figure in the cryptocurrency community that has over two million followers across his various social media platforms, where he posts videos and analysis related to cryptocurrency.

34. Victim-1 followed CJ's posts on YouTube and other social media platforms. Victim-1 found a link on CJ's YouTube channel to an instant messaging group chat on the Telegram instant messaging platform, which was being promoted by CJ as the "NEW TOKEN GROUP."

35. On November 30, 2021, Victim-1 saw a post in the NEW TOKEN GROUP Telegram chat that he believed to be from the genuine CJ. The post stated "VLaunch Token Sale is Live Now" and "SALE IS OPEN UNTIL HARD CAP IS REACHED." The post directed those interested in purchasing the VLaunch cryptocurrency to click on the provided link labeled "VLaunch."

36. Victim-1 clicked the "VLaunch" link and was taken to the website https://vluanch.live/sales [sic]. Upon information and belief, the misspelling of VLaunch in the domain name is indicative of a phishing technique known as "spoofing" where the fraudulent entity deliberately makes a slight variation to the name of a website to mislead victims into believing the site is genuine. The domain vluanch.live was registered on November 25, 2021, only five days before the Telegram chat post.

37. The website featured a link labeled "BUY $VLAUNCH." Upon clicking on that link, Victim-1 was prompted to enter the private key to their cryptocurrency wallet, which Victim-1 provided at approximately 08:00 AM UTC.[2] Minutes later, Victim-1 noticed

[2] All times are in UTC unless otherwise noted.

cryptocurrency being drained from his/her cryptocurrency wallet. Victim-1 tried to intervene and stop the flow of funds but was unable to do so.

38. As set forth in greater detail below, the unknown subject(s) in control of Victim-1's cryptocurrency wallet transferred 25.03 Bitcoin (BTC) and 0.46 Wrapped Bitcoin (WBTC)[3] valued at approximately $1,455,779, and 92.94 Ethereum (ETH) valued at approximately $431,552 to multiple deposit addresses.[4] All but approximately 3.0 BTC of these funds were converted to USDT and Binance-Peg BSC-USD (BSC-USD)[5] and sent to the Subject Deposit Address.

39. On or about December 30, 2021, Tether Ltd. banned the Subject Deposit Address from sending and receiving USDT (a process known as "blacklisting") due to suspected fraudulent activity and froze 1,091,557.82 USDT associated with the address.

40. Tether Ltd. received one email on July 14, 2022, from an individual known as "Denis" claiming ownership of the USDT contained within the Subject Deposit Address. Nonetheless, "Denis" did not provide any personally identifiable information. Tether Ltd. elected to keep the USDT associated with the Subject Deposit Address frozen.

41. Notably, "Denis" wrote Tether Ltd. from the email address bosstyt2018@proton.me, which is associated with the Swiss-based end-to-end encrypted email service Proton Mail.

---

[3] Wrapped Bitcoin (WBTC) is a variation of Bitcoin that can be used on the Ethereum blockchain.

[4] Due to the daily fluctuations in the cryptocurrency valuations, all cryptocurrency values herein are approximate based on the time of theft.

[5] Binance-Peg (BSC-USD) is a type of cryptocurrency that operates on a blockchain known as the BNB Chain. Like USDT, BSEC-USD is a stablecoin whose value is pegged to the U.S. dollar.

**A. Theft from Vicitim-1's Bitcoin Public Addresses**

42. On November 30, 2021, at approximately 08:03 AM, and after Victim-1 lost control of Victim-1's cryptocurrency wallet, unknown subject(s) transferred 25.03 BTC from three Bitcoin public addresses ("Victim-1 BTC Address-1," "Victim-1 BTC Address-2," and "Victim-1 BTC Address-3") contained within the wallet. Specifically, unknown subject(s) transferred 12.13 BTC from Victim-1 BTC Address-1 to a Bitcoin public address beginning with bc1qxgz84t, which was subsequently sent to another Bitcoin public address beginning with bc1q06s954. Unknown subject(s) also transferred 4.05 BTC from Victim-1 BTC Address-2 and 8.85 BTC from Victim-1 BTC Address-3 to the Bitcoin public address beginning with bc1q06s954, consolidating all 25.03 of Victim-1's BTC in that one public address.

43. From that Bitcoin public address beginning with bc1q06s954, the unknown subject(s) sent Victim-1's stolen BTC directly to the cryptocurrency platform SafePal.io[6] and to other Bitcoin public addresses in a series of transactions. Records received from SafePal.io reveal that the incoming transactions consisting of Victim-1's stolen BTC were converted to USDT, BSC-USD, ETH, and Binance Coin (BNB)[7] and then sent to the Subject Deposit Address. The Victim-1 funds that were converted to ETH and BNB were subsequently converted to USDT and BSC-USD at the decentralized exchanges[8] 1inch Network and

---

[6] SafePal.io is a hardware wallet provider that also allows users to buy and sell cryptocurrency from SafePal's user interface.

[7] Binance Coin (BNB) is a cryptocurrency that operates on a blockchain known as BNB Chain.

[8] A decentralized cryptocurrency exchange is a peer-to-peer marketplace that connects cryptocurrency buyers and sellers. In contrast to centralized exchanges, decentralized platforms are non-custodial, meaning a user remains in control of their private keys when transacting on a decentralized platform.

PancakeSwap shortly after being sent to the Subject Deposit Address. Upon information and belief, the use of SafePal.io and the other decentralized exchanges to convert stolen proceeds for use on different blockchains is consistent with a money laundering technique known as "chain hopping," where the fraudulent entity moves stolen proceeds from one blockchain to another in an effort to obfuscate the source of those proceeds.

44. In total, 22.09 of the BTC stolen from Victim-1 were sent to SafePal.io, resulting in 996,927.80 BSC-USD and 236,069.81 USDT being sent to the Subject Deposit Address.

**B. Theft from Victim-1's Ethereum Public Addresses**

45. Also on November 30, 2021, in addition to the 25.03 BTC stolen from Victim-1's wallet, Victim-1 also had three ETH public addresses ("Victim-1 ETH Address-1," "Victim-1 ETH Address-2" and "Victim-1 ETH Address-3") that were compromised as a result of the fraud scheme.

46. At approximately 08:03 AM (which is the same time of the transaction that drained Victim-1 BTC Address-1), unknown subject(s) transferred 75.99 ETH from Victim-1 ETH Address-1 to an Ethereum public address beginning with 0xB31d2BBA (the "Consolidation Address"). At 08:19 AM, unknown subject(s) transferred 70.00 ETH from the Consolidation Address to the Subject Deposit Address. At 08:36 AM, unknown subject(s) transferred an additional 0.15 ETH from Victim-1 ETH Address-1 directly to the Subject Deposit Address.

47. At approximately 08:38 AM, unknown subject(s) transferred 15.61 ETH from Victim-1 ETH Address-2 to Victim-1 ETH Address-3. At approximately 08:43 AM, unknown subject(s) then transferred 14.72 ETH from Victim-1 ETH Address-3 to the Subject Deposit Address.

48. At approximately 08:37 AM, unknown subject(s) transferred an additional 0.46 WBTC from Victim-1 ETH Address-3 to the Subject Deposit Address. At 09:16 AM, the 0.46 WBTC transferred to the Subject Deposit Address was traded at the decentralized cryptocurrency exchange Uniswap for 26,618.46 USDT which was sent back to the Subject Deposit Address.

49. At approximately 08:56 AM, unknown subject(s) transferred an additional 1.18 ETH from Victim-1 ETH Address-3 to the Subject Deposit Address.

50. Thereafter, at approximately 04:18 PM, the 1.18 ETH from Victim-1 ETH Address-3 and the 0.15 ETH from Victim-1 ETH Address-1 were commingled with 24.73 ETH derived from Victim-1's BTC. Based upon an analysis of public blockchain analysis, such cryptocurrency was traded at the decentralized exchange 1inch Network for 123,290 USDT, which was sent back to the Subject Deposit Address.

51. At approximately 08:31 AM and 08:55 AM, 69 ETH and 14.65 ETH held in the Subject Deposit Address, respectively, were traded at the decentralized cryptocurrency exchange 1inch Network for 369,163.23 USDT, which was sent back to the Subject Deposit Address.

52. At approximately 04:29 PM, 6 ETH stolen from Victim-1 ETH Address-1 that remained in the Consolidation Address was traded at the decentralized cryptocurrency exchange Uniswap for 27,702.31 USDT, which was sent back to the Consolidation Address. On December 4, 2021, 130,000 USDT was sent from the Consolidation Address to the Subject Deposit Address.

53. In total, 92.94 ETH was stolen from Victim-1, which resulted in approximately 525,781.68 USDT being transferred to the Subject Deposit Address.

54. As a result of the scheme described above, 25.03 BTC, 92.94 ETH, and 0.46 WBTC (together valued at approximately $1,886,598 at the time of theft) were stolen from Victim-1. All but approximately 3.0 BTC of these funds were converted to 659,553.81 USDT and 996,927.80 BSC-USD and were sent to the Subject Deposit Address.

55. On or about November 26, 2025, the Honorable Robert M. Levy, United States Magistrate Judge for the Eastern District of New York, re-issued a seizure warrant for the properties identified in this Verified Complaint *in Rem* as the Defendants *In Rem*.[9]

56. As of March 30, 2026, a total of approximately 1,091,642.85 USDT was seized from the Subject Deposit Address at Tether, Ltd. and is currently in the custody of the United States Secret Service.

**FIRST CLAIM FOR RELIEF**
**(Proceeds Traceable to Wire Fraud)**

57. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 52 as if fully set forth herein.

58. The Defendants *In Rem* represent property which constitutes or is derived from proceeds traceable to an offense constituting a "specified unlawful activity" or conspiracy to commit such offenses, which includes a violation of 18 U.S.C. § 1343, or a conspiracy to commit such offenses, in violation of 18 U.S.C. § 1349.

---

[9] On February 1, 2024, the Honorable Robert M. Levy, United States Magistrate Judge for the Eastern District of New York, issued a seizure warrant for the properties identified in this Verified Complaint in Rem as the Defendants *In Rem* (the "2024 Seizure Warrant"). See 24-MJ-85. However, at that time the 2024 Seizure Warrant was not executed. At the time, Tether, Ltd. was registered in the British Virgin Islands and maintained offices in Hong Kong. Following the issuance of the 2024 Seizure Warrant, law enforcement learned of then-contemporaneous discussions between U.S. authorities and Tether, Ltd. about whether Tether Ltd. would comply with seizure warrants issued by the United States District Courts. Given those then-ongoing discussions, the government did not serve the 2024 Seizure Warrant upon Tether Ltd. Since 2024, Tether Ltd. has relocated its headquarters to El Salvador and has complied with seizure warrants issued by the United States District Courts.

59. As a result, the Defendants *In Rem* are liable to condemnation and forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C).

**SECOND CLAIM FOR RELIEF**
**(Property Involved in Money Laundering)**

60. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 52 as if fully set forth herein.

61. The Defendants *In Rem* represents property involved in or traceable to property involved in a transaction or attempted transaction of money laundering, or a conspiracy to commit such offenses, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h).

62. As a result, the Defendants *In Rem* are liable to condemnation and forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, Plaintiff, the United States of America, requests that: a warrant be issued by the Clerk of Court for the arrest of the Defendants *In Rem*; due process issue to enforce the forfeiture of the Defendants *In Rem*; that due notice of these proceedings be given to all interested persons to appear and show cause why forfeiture should not be decreed; that this Court decree the Defendants *In Rem* be forfeited and condemned to the use of the United States of America for disposition according to law; that the Plaintiff be awarded its costs and

disbursements in this action, and for such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
August 27, 2026

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
*Attorney for Plaintiff*
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/ John Vagelatos
John Vagelatos
Assistant United States Attorney
(718) 254-6182
John.Vagelatos@usdoj.gov

**VERIFICATION**

Gino Fornaro hereby declares as follows:

1. I am a Special Agent with the United States Secret Service, Department of Homeland Security.

2. I have read the Verified Complaint *in rem* and know the contents thereof.

3. The matters contained in the within Verified Complaint *in rem* are true and accurate to the best of my knowledge, information and belief.

4. The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers, and the official files and records of the Department of Homeland Security and other law enforcement agencies.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated: Brooklyn, New York
August 27, 2026

Gino Fornaro 08/27/26
Special Agent
United States Secret Service
Department of Homeland Security